**AMERICAN GENERAL FIRE AND CASUALTY COMPANY, Plaintiff,**

v.

**TRUCK INSURANCE EXCHANGE, Defendant.**

**Civ. A. No. 86–2106.**

United States District Court, D. Kansas.

April 21, 1987.

Jerome V. Bales, Wallace, Saunders, Austin, Brown & Enochs, Overland Park, Kan., for plaintiff.

Edward M. Boyle, Payne & Jones, Overland Park, Kan., for defendant.

## MEMORANDUM AND ORDER

### EARL E. O'CONNOR, Chief Judge.

This action was brought by the plaintiff, American General Fire and Casualty Company ["American General"],[1] pursuant to the Declaratory Judgments Act, 28 U.S.C. §§ 2201 et seq. American General alleges that it is entitled to indemnification from the defendant, Truck Insurance Exchange ["TIE"], for claims arising out of a motor vehicle accident which occurred on March 11, 1983, in Kansas City, Kansas. This case raises an issue that has troubled numerous federal and state courts in recent years: the determination of the ultimate liabilities of lessors, lessees and insurers of trucks used in interstate commerce when those vehicles are involved in accidents. The matter is now before the court on the defendant's motion for summary judgment and the plaintiff's cross-motion for summary judgment.

To rule favorably on a motion for summary judgment, the court must first determine that the matters on file regarding the motion "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Pleadings and documentary evidence must be liberally construed in favor of the party opposing the motion. *Thomas v. United States Dept. of Energy*, 719 F.2d 342, 344 (10th Cir.1983). A party resisting a motion for summary judgment, however, must set forth specific facts showing that there is a genuine issue for trial. *Dart Indus., Inc. v. Plunkett Co. of Oklahoma, Inc.*, 704 F.2d 496, 498 (10th Cir.1983).

### I. *Facts.*

In order to resolve the issues at hand, it is necessary to go into considerable detail as to the facts in the case and the applicable law. The facts are undisputed. On March 11, 1983, Timothy Myers was driving a semi-tractor pulling two semi-trailers when he was involved in a multiple-vehicle collision. The truck and trailers were owned by Bunger Construction, Inc., and/or Texas Storage Rental, Inc. Timothy Myers was a salaried employee of Bunger and was operating the truck with his employer's permission. At the time of the collision, Bunger had a liability insurance policy issued by American General, a member of the Maryland Casualty Group. The truck and trailers involved in the accident were listed in the policy as "covered autos." Under the policy, American General agreed to pay all sums the "insured" was legally obligated to pay because of bodily injury or property damage caused by an accident and resulting from the ownership, maintenance or use of a covered vehicle. "Insured" was defined in the policy to include anyone using a covered vehicle with Bunger's permission. Primary insurance specifically was provided for any covered vehicle. The policy also had an "other insurance" clause whereby American General only agreed to pay a pro rata share of the damages if two or more insurance policies covered the claims.

At the time of the collision, the truck driven by Timothy Myers was engaged in transporting property for C. Maxwell Trucking Company pursuant to a one-way (trip) lease between Bunger, as lessor, and C. Maxwell, as lessee. The truck was being operated under the ICC placards of C. Maxwell. Under the lease, Bunger furnished the driver, as well as the leased equipment. The lease agreement also provided:

It is understood that leased equipment under the Agreement is in the exclusive possession, control and use of the authorized carrier, lessee [C. Maxwell], and the lessee assumes full responsibility in respect to the equipment it is operating to the public, the shippers, and all regulatory bodies having jurisdiction. It is agreed that the lessor [Bunger] will carry acceptable public liability and prop-

---

**1.** This action was originally filed by Maryland Casualty Company. On April 1, 1987, this court granted Maryland's motion for leave to amend its complaint to substitute American General as the proper plaintiff.

erty damage insurance, lessor agrees to reimburse and otherwise indemnify lessee for any and all losses sustained by lessee resulting from the use of the aforesaid equipment.

At the time of the accident, the lessee, C. Maxwell, was an interstate carrier subject to regulation by the Interstate Commerce Commission (ICC). On March 11, 1983, C. Maxwell was insured under a liability insurance policy issued by the defendant, TIE. Under this policy, TIE agreed to pay all sums the "insured" was required to pay as damage because of bodily injury sustained in a covered occurrence. As a precondition to its liability, the TIE policy required a final judgment to be entered against the insured or a written agreement executed by the insured, the claimant and the insurance company. "Insured" was defined in the policy to include only C. Maxwell and any of its executive officers, directors or stockholders who were acting within the scope of their duties; the policy did *not* contain an omnibus or "permissive user" clause. Finally, the policy expressly specified that it only provided "excess" insurance if other insurance was applicable.

Since C. Maxwell was subject to regulation by the ICC, the TIE policy also contained a special endorsement, ICC form BMC 90. In this endorsement, the defendant agreed to pay, within the policy limits, any final judgment recovered against the "insured" for bodily injury or property damage resulting from negligence in the operation, maintenance or use of any motor vehicle under the insured's certificate of public conveyance and necessity. This endorsement also stated that "no condition, provision, stipulation, or limitation contained in the policy ... shall relieve the Company from liability hereunder or from the payment of any such final judgment...."

Subsequent to the collision in question, a personal injury suit was filed in the District Court of Wyandotte County, Kansas, by Cledyth and Margaret Markum. This action was brought against Timothy Myers and Bunger Construction, Inc. The Markums alleged that the truck was negligently driven by Myers and negligently maintained by Bunger. The suit was removed to federal court (Case No. 84–2017) where American General, pursuant to the terms of its policy, defended Myers and Bunger. Prior to any final judgment, plaintiff paid the Markums $150,000.00 in exchange for a general release of all claims. C. Maxwell and Truck Insurance Exchange were never made parties to the Markum action.

On March 11, 1986, American General's predecessor filed this action seeking a declaratory judgment that the insurance policy issued by TIE to C. Maxwell provided primary coverage for the Markum claims, and that American General's policy was only excess coverage for those claims. Plaintiff argues that defendant is the primary insurer due to the Interstate Commerce Act and regulations issued by the ICC.

II. *Applicable Federal Statutes and Regulations.*

The key issue raised in the dispute between these parties is the effect of relevant federal statutes and federal regulations promulgated by the Interstate Commerce Commission (ICC). These statutes and regulations were developed in response to the increasing use of nonowned vehicles by ICC-licensed motor carriers. The expanding use of leased or interchanged vehicles led to a number of abuses which threatened the public interest and the economic stability of the industry. *See American Trucking Ass'n v. United States,* 344 U.S. 298, 304–05, 73 S.Ct. 307, 311–12, 97 L.Ed. 337 (1953). In some cases, ICC-licensed carriers used leased or interchanged vehicles to avoid safety regulations governing equipment and drivers. *Id.* at 305, 73 S.Ct. at 321; *see also Indiana Refrigerator Lines, Inc. v. Dalton,* 516 F.2d 795, 796 (6th Cir.), *cert. denied,* 423 U.S. 985, 96 S.Ct. 392, 46 L.Ed.2d 302 (1975). Interstate carriers also used the nonowned vehicles to circumvent ICC territorial restrictions and operate in areas outside that allowed in their license. *American Trucking Ass'n v. United States,* 344 U.S. at 304, 73 S.Ct. at 311; *Carolina Casualty Ins. Co. v. Insur-*

*ance Co. of N. Am.*, 595 F.2d 128, 137 (3d Cir.1979).

In order to address these problems, the Interstate Commerce Act was amended. As amended, the Act provided that the ICC could prescribe regulations governing the use of leased vehicles by motor carriers to ensure that the motor carrier would be fully responsible for the vehicle's operation. 49 U.S.C. § 304(e) (1956). Section 304 was substantially revised by Congress in 1978. Those portions relating to vehicles leased by motor carriers were reenacted in different form and codified at 49 U.S.C. §§ 10927, 11107.

Under current law, all ICC-certified carriers must file an insurance policy or other form of surety with the ICC which is "sufficient to pay ... for each final judgment against the carrier for bodily injury to, or death of, an individual resulting from the negligent operation, maintenance, or use of motor vehicles" under the carrier's permit. 49 U.S.C. § 10927(a)(1). This statutory requirement is mirrored in the ICC's regulations. 49 C.F.R. § 1043.1(a). In addition, 49 U.S.C. § 11107(a)(3) requires a "motor carrier ... that uses motor vehicles not owned by it to transport property under an arrangement with another party to ... obtain liability and cargo insurance on [the vehicles]...." To ensure compliance with these mandates, the ICC has developed various forms to be used as endorsements to carriers' insurance policies. *See* 49 C.F.R. § 1003.3.

In addition to requiring carriers to obtain liability insurance, Congress and the ICC also have imposed "control and responsibility" obligations on the carriers. A motor carrier subject to ICC jurisdiction is required to "have control of and be responsible for operating those [leased] motor vehicles." 49 U.S.C. § 11107(a)(4). To enforce this provision, the ICC regulations mandate that every lease entered into by an ICC-licensed carrier contain a provision that states the interstate carrier/lessee has "exclusive possession, control and use of the equipment for the duration of the lease." 49 C.F.R. § 1057.12(c) (1982). The lease also must provide that the carrier/lessee "assume[s] complete responsibility for the operation of the equipment" during the term of the lease. *Id.* Requiring the carrier to assume "control and responsibility" ensures that shippers and members of the public are protected by holding licensed, financially sound carriers responsible for the maintenance of leased equipment and control of borrowed drivers. *Transamerica Freight Lines, Inc. v. Brada Miller Freight Sys., Inc.*, 423 U.S. 28, 34, 96 S.Ct. 229, 232, 46 L.Ed.2d 169 (1975). *See also Rodriguez v. Ager*, 705 F.2d 1229, 1232 (10th Cir.1983).

### III. *Effect of ICC Regulations.*

C. Maxwell, the lessee in this case, is a licensed carrier subject to the statutes and regulations governing interstate carriers. The parties vigorously dispute how these federal provisions affect the liability of TIE as insurer of the carrier. The issue of whether a lessor/owner's insurer or a lessee/carrier's insurer is liable for personal injuries sustained in an accident has been the subject of considerable litigation. However, no real consensus has been reached between the state and federal courts on the issue.[2] Therefore, the court will attempt to analyze the two main lines of cases that have developed on the issue.

### A. *Argonaut and its Progeny.*

The Tenth Circuit was one of the first courts to address the question of the insurers' liability for vehicles leased by interstate carriers. The Tenth Circuit's view was initially set forth in *Argonaut Ins. Co. v. National Indem. Co.*, 435 F.2d 718 (10th

---

**2.** One source of confusion on this issue is the multifarious factual variations which can arise in these types of cases. Results have varied when both parties are ICC-licensed carriers, *see, e.g., Carolina Casualty Ins. Co. v. Transport Indem. Co.*, 488 F.2d 790 (10th Cir.1973), when the terms of the insurance policies differ, *see, e.g., Transport Indem. Co. v. Paxton National Ins.*

*Co.*, 657 F.2d 657 (5th Cir.1981), *cert. denied,* 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 692 (1982), or when the relations between the parties are such to create a circuitry problem, *see, e.g., Carolina Casualty Ins. Co. v. Transport Indem. Co.*, 488 F.2d 790 (10th Cir.1973). As discussed later, these factual variations are vital in reaching a correct solution in these cases.

Cir.1971), and applied in *Hagans v. Glens Falls Ins. Co.*, 465 F.2d 1249 (10th Cir. 1972), and *Carolina Casualty Ins. Co. v. Transport Indem. Co.*, 488 F.2d 790 (10th Cir.1973).

In *Argonaut*, Executive Car Leasing hired Auto-Driveaway to transport one of Executive's rental cars from Oklahoma to California. Auto-Driveaway hired Blankenship to transport the car. En route, Blankenship was involved in a collision which resulted in the death of a man named Seymour. Seymour's estate sued Blankenship and Auto-Driveaway. Auto-Driveaway, an ICC-licensed carrier, was insured by Argonaut Insurance Company. Argonaut settled with the estate and then sued Executive's insurer, National Indemnity Company, claiming National had primary coverage. Argonaut argued that since National insured the owner of the vehicle, it was primarily liable under California law. 435 F.2d at 719. The Tenth Circuit held that Argonaut was the primary insurer[3] because its policy contained the ICC endorsement which stated that "no condition, provision, stipulation, or limitation of the policy 'shall relieve the Company ... from liability hereunder.'" 435 F.2d at 720. The court ruled that this endorsement "nullified" the "excess" provisions in its policy and, therefore, Argonaut provided primary coverage. *Id.* at 720. Since Argonaut furnished primary coverage, National's excess-other insurance provisions went into effect. National's "excess" coverage did not apply since the settlement was within Argonaut's policy limits. *Id.* at 721.

The Tenth Circuit applied its holding in *Argonaut* to a dispute between two insurance companies in *Hagans v. Glens Falls Ins. Co.*, 465 F.2d 1249 (10th Cir.1972). In *Hagans*, the plaintiff Ryder Truck Rental (lessor) leased a truck to Far-Go (lessee). As part of the lease, the parties agreed to maintain public liability insurance and name the other as additional insureds under those policies. In addition, Far-Go, as lessee, agreed to indemnify Ryder for any claims arising from the use of the truck. Ryder's insurance was obtained from Liberty Mutual Insurance Company. Far-Go obtained insurance from the defendant, Glens Falls. Glens Falls then filed with the ICC certificates of insurance for Far-Go which contained a standard BMC 90 endorsement. While driving the leased truck, an employee of Far-Go was involved in a serious collision with two other vehicles. Liberty Mutual was forced to defend Ryder in subsequent litigation. The claims were paid by Ryder and Liberty Mutual, who subsequently brought the action against Glens Falls for reimbursement. *Id.* at 1249–51. The Tenth Circuit found that since Glens Falls' policy contained the ICC endorsement, Glens Falls was a primary insurer as a matter of law. Furthermore, the Tenth Circuit found that Glens Falls' primary insurer status could not be altered by the lease agreement between the insureds. *Id.* at 1252.

In its third case in three years, the Tenth Circuit was faced with somewhat different facts in *Carolina Casualty Ins. Co. v. Transport Indem. Co.*, 488 F.2d 790 (10th Cir.1973). In that case, Andico (lessor) leased one of its trucks and a driver to Ringsby Trucking Company. Carolina Casualty had issued a liability insurance policy to Andico. This policy specifically covered the leased truck and also contained a permissive user clause. A BMC 90 endorsement was also added to the lessor's policy. The lessee, Ringsby, was insured by Transport. The Transport policy only named Ringsby as the insured and also contained the BMC 90 endorsement. When the truck was involved in an accident during the lease, all the parties were threatened with lawsuits. Carolina Casualty then brought

---

**3.** Another source of confusion in many of these cases is the use of the term "primary" when describing an insurer. Many courts fail to distinguish the two different uses of the word "primary." When applied to a tort action, it refers to the financial liability to the injured party— i.e., an active tortfeasor may be imposed with primary liability for injuries by common law or statute. However, when the term is applied to an insurance policy, primary liability must be compared to excess liability. *Aviles v. Burgos*, 783 F.2d 270, 278 (1st Cir.1986). The court will be careful to distinguish between primary insurance coverage and primary liability.

a declaratory judgment action for a determination of the insurers' respective duties.

In examining the facts, the Tenth Circuit found that Ringsby and the truck driver were both covered under Carolina's omnibus clause as permissive users. *Id.* at 794. Since Carolina's policy also contained the ICC endorsement, the court found that its coverage was primary. On the other hand, the court found that Transport's policy only covered Ringsby. Consequently, Transport, as Ringsby's subrogee, would be entitled to indemnity from the driver.[4] Since the driver was insured under the Carolina policy, Transport would be ultimately recovering from Carolina. In order to avoid this circuitry of action, the court held that only Carolina's policy was primary. *Id.* at 794.

A few other courts have followed the Tenth Circuit cases. *See, e.g., Aetna Casualty & Surety Co. v. Arkin,* 365 F.Supp. 813 (N.D.Ill.1973); *Transport Indem. Co. v. Carolina Casualty Ins. Co.,* 133 Ariz. 395, 652 P.2d 134 (1982); *Federal Ins. Co. v. Allstate Ins. Co.,* 275 Md. 460, 341 A.2d 399 (1975).

### B. *Other Cases.*

At least five other circuits have addressed these issues and have rejected the Tenth Circuit's holding that the presence of an ICC endorsement makes the carrier a primary insurer as a matter of law. Most of these decisions arise from disputes between the insurance companies of lessors and lessees of motor carrier equipment. *See, e.g., Travelers Ins. Co. v. Transport Ins. Co.,* 787 F.2d 1133 (7th Cir.1986); *Grinnell Mut. Reinsur. Co. v. Empire Fire & Marine Ins. Co.,* 722 F.2d 1400 (8th

Cir.1983), *cert. denied,* 466 U.S. 951, 104 S.Ct. 2155, 80 L.Ed.2d 540 (1984); *Transport Indem. Co. v. Paxton Nat'l Ins. Co.,* 657 F.2d 657 (5th Cir.1981), *cert. denied,* 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 692 (1982); *Carolina Casualty Ins. Co. v. Insurance Co. of N. Am.,* 595 F.2d 128 (3d Cir.1979); *Carolina Casualty Ins. Co. v. Transport Indem. Co.,* 533 F.Supp. 22 (D.S.C.1981), *aff'd by unpublished opinion,* 676 F.2d 690 (4th Cir.), *cert. denied,* 459 U.S. 829, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982).[5] The United States Supreme Court has yet to directly resolve this apparent disagreement between the circuits.[6]

Generally, these courts reasoned that the federal statutes and regulations in question were designed to ensure that the ICC carrier had independent financial responsibility to pay for losses sustained by the *general public* arising out of its trucking operations. Once this *public* interest was satisfied, "the pertinent question [became] whether the federal policy of assuring compensation for loss to the public prevent[ed] courts from examining the manner in which private agreements or state laws would otherwise allocate the ultimate financial burden of the injury." *Carolina Casualty Ins. Co. v. Insurance Co. of N. Am.,* 595 F.2d at 138. These courts held that the ICC policy did not alter the allocation of insurance coverage as determined by state law or private agreements. *Id.*

Some of these courts apparently have gone to the extent of ignoring the provisions of the ICC endorsement when determining ultimate responsibility between insurers. For example, in *Grinnell Mut. Reinsur. Co. v. Empire Fire & Marine Ins. Co.,* 722 F.2d 1400 (8th Cir.1983), *cert.*

---

**4.** The court here assumed that Ringsby's liability would be solely vicarious.

**5.** Various states have also rejected the Tenth Circuit's reasoning in *Argonaut. See, e.g., Marwell Const. Inc. v. Underwriters at Lloyd's, London,* 465 P.2d 298 (Alaska 1970); *Argonaut Ins. Co. v. Transport Indem. Co.,* 6 Cal.3d 496, 492 P.2d 673, 99 Cal.Rptr. 617 (1972); *Ryder Truck Lines, Inc. v. Carolina Casualty Ins. Co.,* 270 Ind. 315, 385 N.E.2d 449 (1979); *Great W. Casualty Co. v. Mallinger Truck Line, Inc.,* 640 S.W.2d 479 (Mo.App.1982); *Truck Ins. Exchange v. Transport Indem. Co.,* 180 Mont. 419, 591 P.2d 188

(1979); *Mission Ins. Co. v. Allendale Mut. Ins. Co.,* 95 Wash.2d 464, 626 P.2d 505 (1981); *Nowak v. Transport Indem. Co.,* 120 Wis.2d 635, 358 N.W.2d 294 (1984).

**6.** The United States Supreme Court refused to resolve the dispute between the circuits when it denied certiorari in *Paxton Nat'l Ins. Co. v. Transport Indem. Co.,* 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 692 (1982). Justice White would have granted certiorari in order to resolve the conflict. *Id.*

*denied,* 466 U.S. 951, 104 S.Ct. 2155, 80 L.Ed.2d 540 (1984), the lessee/carrier's insurer, Excalibur, settled a personal injury claim and then sought indemnification from the lessor's insurer, Grinnell. The court noted that the carrier had complied with federal regulations by obtaining proper public liability insurance. *Id.* at 1406. However, the court relied on the general terms of Excalibur's policy to find it provided excess insurance. *Id.* at 1405. No mention was made of the endorsement required by the ICC or how it might affect Excalibur's "excess" insurance provision. Other courts have also ignored the endorsement. *See Transport Indem. Co. v. Paxton Nat'l Ins. Co.,* 657 F.2d 657, 659–60 (5th Cir. 1981), *cert. denied,* 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 692 (1982) (carrier's insurer only provided excess coverage and that coverage was not altered by the attached ICC endorsement); *Carolina Casualty Ins. Co. v. Underwriters Ins. Co.,* 569 F.2d 304, 313 (5th Cir.1978) (excess-other insurance clause in carrier's policy not voided by federal law; conflicting excess clauses cancelled each other so insurers were co-primary).

### C. *Analysis of Conflicting Views.*

The majority of courts that have addressed this difficult issue have decided that the presence of an ICC-mandated endorsement in a carrier's insurance policy does not make the carrier's insurer a primary insurer as a matter of law. In so doing, they have rejected the Tenth Circuit's view. However, we do not believe that the Tenth Circuit's decisions can be cast aside summarily.

We first note that many of the courts that have declined to follow or have questioned the Tenth Circuit's cases have read the language in *Argonaut* and *Hagans* very broadly. Yet we perceive the holdings of the two cases to be based on the particular facts of each case and not to be as absolute as they may seem on first reading. *Argonaut* speaks of the ICC endorsement making the carrier's insurer's policy "primary as a matter of law." The court emphasized that the terms of the endorsement prevailed over inconsistent terms in the body of the policy. 435 F.2d at 720. Since the endorsement provided that "no condition ... or limitation contained in the policy ... shall relieve the Company from liability hereunder ...," the excess coverage provisions in the policy were nullified. Consequently, the carrier's insurer was liable for primary coverage under the terms of the policy, *as modified by the endorsement.* Furthermore, in examining the policy issued by National, the court found that since Argonaut provided primary coverage, National's excess-other insurance clause was triggered. Because the settlement was for less than Argonaut's policy limits, National's excess coverage was not applicable. *Id.* at 720–21. Therefore, reading the case in light of its particular facts, we believe that the court only intended to hold: (1) that the inclusion of the endorsement modifies inconsistent terms in the insurance policy; and (2) that *under the terms* of both policies involved, Argonaut was a primary insurer and National's coverage was excess only.

Regrettably, the broad language of *Argonaut* was used by the Tenth Circuit in *Hagans.* Yet in *Hagans,* the carrier's insurer, Glens Falls, *conceded* that it was the primary insurer. Glens Falls, however, attempted to evade its responsibilities as the primary insurer based on an indemnification clause found in the lease agreement. 465 F.2d at 1251. The court merely refused to alter Glens Falls' responsibilities under its policy because of the provision in the lease agreement to which it was not a party. *Id.* at 1253.

The court also is convinced that the Tenth Circuit would now read the holdings in *Argonaut* and *Hagans* more narrowly in light of the subsequent Supreme Court decision in *Transamerica Freight Lines, Inc. v. Brada Miller Freight Sys., Inc.,* 423 U.S. 28, 96 S.Ct. 229, 46 L.Ed.2d 169 (1975). That case involved a dispute between two licensed motor carriers. Brada Miller had leased a vehicle to Transamerica and, as required by regulations, the lease stated that the lessee (Transamerica) was to "have the control and responsibility for the operation of said equipment in respect to

the public, shippers and [ICC]." The lease also contained a provision whereby the lessor (Brada Miller) agreed to indemnify Transamerica for claims arising out of the lessor's negligence. An accident occurred while the equipment was being used under the lease and both carriers were sued. Transamerica settled the claim and then sought indemnification from Brada Miller. The trial court ruled that the indemnification clause was void because it contravened the "control and responsibility" regulation issued by the ICC. The Seventh Circuit Court of Appeals affirmed. *Id.* at 30–34, 96 S.Ct. at 230–32.

In writing for a unanimous Court, Justice Blackmun began with an overview of the development of statutes and ICC regulations relating to the leasing of equipment by licensed motor carriers. Based on this evaluation, the Court held:

> The regulations do not expressly prohibit an indemnification provision in the agreement between the lessor and the lessee. In fact, they neither sanction nor forbid it. It would seem to follow, then, that the mere presence of a clause such as the one here—that the lessor is to bear the burden of its own negligence—does not, in and of itself, offend the regulations *so long as the lessee does not absolve itself from the duties to the public and to shippers imposed upon it by the Commission's regulations.*

*Id.* at 39–40, 96 S.Ct. at 234–35 (emphasis added). The Court further noted that upholding the validity of the indemnification provisions would not negatively impact on safety, which was a key concern in the development of the ICC regulations. *Id.* at 41, 96 S.Ct. at 235.

While the *Brada Miller* decision was limited to the facts in issue in that case, the decision raises questions about the public policy relied on in *Argonaut* and *Hagans.* As read by other circuits, these Tenth Circuit cases purport to hold that public policy mandates that the interstate carrier and its insurer be *primarily liable* for any damages. However, in *Brada Miller* the Supreme Court held that neither federal statutes nor regulations prohibited the own-er/lessor and the carrier/lessee from allocating the ultimate liability as between themselves, as long as the carrier does not circumvent the duties imposed on it to the public and to shippers. 423 U.S. at 39–40, 96 S.Ct. at 234–35. As the Supreme Court noted, when both the lessor and lessee are exposed to liability, safety could be enhanced. *Id.* at 41, 96 S.Ct. at 235.

 Consequently, there is no reason for us to read *Argonaut* and *Hagans* in such a far-reaching light. Based on the facts in those cases, the carriers' insurers were the only sources of primary insurance coverage pursuant to the terms of the insurance policies involved. Those decisions should not be read to mean that the carrier and its insurer are, by law, the *only* source of financial recourse for damages caused by the operation of interstate motor carriers. Similarly, there is no reason that state laws or private agreements should not be able to allocate *ultimate* financial responsibility in such a situation. *Carolina Casualty Ins. Co. v. Insurance Co. of N. Am.,* 595 F.2d 128, 138 (3d Cir.1979). Nor does public policy dictate that insurers of truck owners be absolved from the risks they voluntarily assumed solely because the vehicle was leased to an interstate carrier. *Carolina Casualty Ins. Co. v. Transport Indem. Co.,* 533 F.Supp. 22, 25 (D.S.C.1981), *aff'd by unpublished opinion,* 676 F.2d 690 (4th Cir.), *cert. denied,* 459 U.S. 829, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982).

Our narrow reading of the Tenth Circuit precedent brings us more in line with the analysis used by other circuits, but it should not be construed as a total adoption of their holdings. Several of these courts, in rejecting *Argonaut,* have gone to the extreme of completely ignoring the terms of the endorsements made part of the carrier's insurance policies. *See, e.g., Grinnell Mut. Reinsur. Co. v. Empire Fire & Marine Ins. Co.,* 722 F.2d 1400 (8th Cir.1983), *cert. denied* 466 U.S. 951, 104 S.Ct. 2155, 80 L.Ed.2d 540 (1984); *Transport Indem. Co. v. Paxton Nat'l Ins. Co.,* 657 F.2d 657 (5th Cir.1981), *cert. denied,* 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 692 (1982); *Car-*

*olina Casualty Ins. Co. v. Insurance Co. of N. Am.*, 595 F.2d 128 (3d Cir.1979). Instead, they have applied the "other insurance" clauses in the policies and reasoned that:

> ICC policy factors are frequently determinative where protection of a member of the public or a shipper is at stake, but those factors cannot be invoked by another insurance company which has contracted to insure a specific risk and which needs no equivalent protection.

*Carolina Casualty Ins. Co. v. Underwriters Ins. Co.*, 569 F.2d at 313 (footnote omitted).

This reasoning, however, has one fundamental flaw: it allows the court to ignore the endorsement which is part of the policy. It basically says that public policy is satisfied as long as there is an available fund. Its effect is that another insurance company is not be able to enforce the federally required endorsement.

■ As a general rule, "the liability of an insurer and the extent of the loss under a policy of liability or indemnity insurance must be determined, measured, and limited by the terms of the contract." 44 Am. Jur.2d, *Insurance* § 1551, at 552 (1982). In the instant case, the inclusion of the BMC 90 endorsement to TIE's policy, as required by federal law, means that the terms of the endorsement became part of the insurance contract. The fact that public policy issues are not involved when an insurance company is suing the carrier's insurer does not give a court leave to ignore the actual terms of the policy. The Arizona Supreme Court addressed this flaw in *Transport Indem. Co. v. Carolina Casualty Ins. Co.*, 133 Ariz. 395, 652 P.2d 134 (1982):

> Even if we were to hold that federal law does not alone determine the rights of the insurers, we cannot read out of the Transport policy a provision which is in that policy. The fact that federal law imputes that provision when the policy is certified does not allow us to conclude that it is written in special ink which appears for cases involving the public and disappears in cases involving other

insurers. Here, the clause is physically attached to the policy and must be given effect.

*Id.* at 403, 652 P.2d at 142.

■ Consequently, we cannot subscribe fully to the reasoning propounded by the other circuits on this issue. While we agree that the presence of the endorsement modifies any inconsistent terms in the policy in accordance with the teachings of *Argonaut* and *Hagans*, we conclude that when multiple insurers are involved, each insurer's liability is and should be determined by the terms of their policies and, if necessary, state law.

## IV. *Coverage of the Policies.*

### A. *American General's Policy.*

The policy issued by American General to the lessor, Bunger, unequivocally provided primary insurance coverage for this accident. It is undisputed that the tractor and trailers involved in the accident were "covered autos" under the American General policy. Furthermore the policy provided separate coverage for "each insured ... against whom a claim is made or suit is brought." "Insured" was defined in the policy not only to include Bunger, but also "[a]nyone else ... while using with your permission a covered auto you own, hire or borrow...." The policy also included as an insured, "[a]nyone liable for the conduct of an insured...." Finally, the policy clearly stated that it provided primary insurance for any covered vehicle.

■ Based on these provisions, Bunger and the driver, Timothy Myers, were both insureds under the policy, the latter as a permissive user. Furthermore, C. Maxwell Trucking Company was also an insured under this policy. Not only did the policy afford protection to C. Maxwell for its liability incurred vicariously for Myers' negligence, but it also covered C. Maxwell as a permissive user of the covered "auto." *See Carolina Casualty Ins. Co. v. Transport Indem. Co.*, 488 F.2d 790, 794 (10th Cir.1973). For these reasons, American General was obligated to provide primary insurance coverage for this accident.

American General's policy also contained an "other insurance" clause which stated that it would only pay a pro rata share of the liability if other insurance was available.

### B. *TIE's Policy.*

■ The court must now determine the coverage provided by the insurance policy issued by TIE. Under the general terms of the policy (excluding the endorsement), TIE agreed to pay "all the sums which the insured shall become legally obligated to pay...." "Insured" was defined in the policy only to include the named insured (C. Maxwell Trucking Company) and "any partner, executive, officer, director or stockholder thereof while acting within the scope of his duties as such...." The general policy also had an excess insurance clause. As discussed earlier, the attachment of the BMC 90 endorsement acted to modify any inconsistent terms in the policy. *Argonaut*, 435 F.2d at 720; *see also Wise v. Westchester Fire Ins. Co.*, 463 F.2d 386, 389 (10th Cir.1972); *Dronge v. Monarch Ins. Co. of Ohio*, 511 F.Supp. 1, 10 (D.Kan. 1979). Thus, the language of the endorsement prevailed over the "excess insurance" provision of the policy. Consequently, TIE agreed to provide primary insurance for "any final judgment recovered against the insured for bodily injury to or death of any person or loss of or damage to property of others...."

■ Since the policy provided for primary insurance for any final judgment against the insured, it becomes necessary to determine who was included as an "insured" under the policy. American General argues that the driver, Timothy Myers, was an insured under the TIE policy. The court must disagree. As mentioned earlier, the TIE policy defined "insured" very narrowly. There is no evidence that Myers was a partner, executive officer, director or stockholder of C. Maxwell. Furthermore,

nothing in the endorsement alters the definition of "insured."

■ The effect of federal law is to make Myers a "statutory" employee of C. Maxwell. *See, e.g., Mellon Nat'l Bank & Trust Co. v. Sophie Lines, Inc.*, 289 F.2d 473 (3d Cir.1961). However, Myers' employee status does not mean that he was or should have been an insured under the TIE policy. Clearly, he was not insured under the *terms* of the policy. Moreover, this absence of coverage does not violate any provision or policy of federal law. The Interstate Commerce Act only requires that the carrier obtain an insurance policy to cover "each final judgment against *the carrier....*" 49 U.S.C. § 10927; *see also* 49 C.F.R. § 1043.1(a). The public is protected without requiring that the carrier also insure all its drivers. Since the carrier has "complete responsibility for the operation of the equipment" during the lease, 49 U.S.C. § 11107(a)(4), 49 C.F.R. § 1057.12(c), an injured party always has recourse against the carrier for negligent maintenance and/or operation of the carrier's vehicles.[7] Therefore, public policy does not dictate that Myers be considered an insured under TIE's policy. *See Carolina Casualty Ins. Co. v. Transport Indem. Co.*, 533 F.Supp. 22, 26–27 (D.S.C.1981), *aff'd in unpublished opinion*, 676 F.2d 690 (4th Cir.), *cert. denied*, 459 U.S. 829, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982). For these reasons, the court finds that Timothy Meyers was not an insured under the TIE policy.

In conclusion, the court finds that the plaintiff American General provides primary insurance as to the liability of Bunger, Myers and C. Maxwell. The court further finds that the policy issued by TIE provides primary insurance coverage only for "any final judgment" recovered against C. Maxwell.

### V. *Right to Indemnification or Contribution.*

Plaintiff American General argues that it is entitled to indemnification or, in the al-

---

7. The carrier will be held liable for any damages sustained while a vehicle is traveling under the carrier's placards. This liability exists even if the driver was working for another carrier or if he detoured from the required routes. *Rodriguez v. Ager*, 705 F.2d 1229, 1235–36 (10th Cir. 1983).

ternative, contribution from TIE for the settlement paid to the Markums. The right to indemnity is related to the right of contribution, but the two are distinguishable.

> In the case of indemnity the defendant is liable for the whole damage ... springing from contract, while in contribution the defendant is chargeable only with a ratable proportion founded not on contract but upon equitable factors measured by equality of burden.... Stated another way, while contribution distributes the loss equally among all tortfeasors, each bearing his pro rata share, indemnity seeks to transfer the entire loss imposed upon a tortfeasor to another who, in justice and equity, should bear it.

*Symons v. Mueller Co.*, 526 F.2d 13, 16 (10th Cir.1975).

■ The court finds American General is not entitled to indemnification or contribution. Since C. Maxwell is insured by the American General policy as a permissive user, the insurer cannot seek indemnification from the carrier. It is generally recognized that an insurer is not entitled to be subrogated to the right of its *named* assured against an additional insured under the omnibus or "permissive user" clause. *Carolina Casualty Ins. Co. v. Underwriters Ins. Co.*, 569 F.2d 304, 314 (5th Cir. 1978).

■ Even if C. Maxwell was not covered by the plaintiff's policy, American General has failed to bring forward any facts establishing that the primary coverage provided by TIE was applicable to this claim. As noted earlier, the TIE policy specifically provided conditions precedent to its liability. The general terms of the policy required that a judgment be obtained against the insured carrier or an authorized settlement be entered into by TIE and the carrier. This condition was reinforced by the BMC 90 endorsement which extended primary coverage for "any final judgment" recovered against the motor carrier. In this case, the motor carrier was not made a party to *any* action. The Markums chose not to name C. Maxwell as a defendant in their personal injury claim; nor did Bunger or Myers bring the carrier into the action. Finally, the plaintiff failed to name C. Maxwell as a party to this action for indemnification. Since no final judgment was obtained against the carrier by any party in relation to the March 1983 accident, the TIE policy was not effective.

■ Furthermore, TIE's requirement of a final judgment or authorized settlement as a condition precedent to its liability is not contrary to law or public policy. Absent any statutory prohibitions, insurers may impose any conditions upon their obligations, as long as they are consistent with public policy, and if the conditions are plainly expressed, they will be enforced as expressed. 43 Am.Jur.2d, *Insurance* § 1031, at 1034. *See also* 6B J. Appleman, *Insurance Law and Practice* § 4255, at 40. The final judgment prerequisite in TIE's policy does not offend public policy. In fact, all the relevant federal statutes and regulations speak in terms of insurance covering final judgments obtained against the carriers. Since Congress has decided to impose liability on motor carriers for any negligent operation, maintenance or use of vehicles under the carriers' permits, it is not improper for the insurer to require that the carrier be made a party to the action in order to protect their interests. American General has failed to establish any facts which show that the conditions precedent to TIE's liability under the policy have been met. Therefore, it is not entitled to indemnification or contribution from that insurer. The defendant TIE is entitled to summary judgment.

VI. *Summary of Conclusions.*

In summary, the court finds that federal statutes and regulations pertaining to an interstate carrier's use of nonowned equipment do not render the carrier or its insurer *exclusively* liable for personal injuries or property damage sustained in an accident involving such equipment. Instead, federal law, as interpreted by the Tenth Circuit, imposes liability on all insurers who are obligated to provide some type of coverage for the damages pursuant to the terms of

their policies and any endorsements thereto. Under federal law, the insurer of an ICC-licensed carrier is required to provide primary coverage for any final judgment obtained against the carrier.[8] However, the mere fact that an interstate carrier is involved does not absolve other insurers from their obligations under other policies which are applicable to the claims.

Based on the particular facts in this case, the plaintiff American General was obligated to provide primary coverage for the claims against its insureds, Bunger Construction, Inc., Timothy Myers and C. Maxwell Trucking Company. The defendant TIE was obligated under its policy to provide primary coverage for any final judgment obtained against its only insured, C. Maxwell. Since the condition precedent to TIE's liability has not been met, the TIE policy is not effective and American General cannot seek indemnification or contribution from TIE. For these reasons, Truck Insurance Exchange's motion for summary judgment is granted and American General's cross-motion for summary judgment is denied.

IT IS THEREFORE ORDERED that the defendant Truck Insurance Exchange's motion for summary judgment is granted and the plaintiff's complaint is dismissed.

IT IS FURTHER ORDERED that the cross-motion for summary judgment, filed by the plaintiff American General Fire & Casualty Insurance Company, is denied.

---

8. The court notes that while the requirement of primary insurance imposed by the ICC endorsement only extends to final judgments recovered against the insured carrier, nothing prohibits the insurer from entering into an insurance contract for broader primary coverage.