**EMPIRE FIRE AND MARINE INSURANCE COMPANY, Plaintiff–Appellee,**

v.

**GUARANTY NATIONAL INSURANCE COMPANY, Defendant–Appellant.**

No. 87–1116.

United States Court of Appeals, Tenth Circuit.

Feb. 10, 1989.

Kevin L. Ward of Best, Sharp, Thomas, Glass & Atkinson, Tulsa, Okl. (Joseph A. Sharp and Renee J. Harter of Best, Sharp, Thomas, Glass & Atkinson, Tulsa, Okl., on the briefs) for defendant-appellant.

Gerald L. Friedrichsen of Fitzgerald & Brown, Omaha, Neb. (Greg Morris of Morris & Morris, Tulsa, Okl., with him on the brief) for plaintiff-appellee.

Before MOORE, BARRETT and EBEL, Circuit Judges.

EBEL, Circuit Judge.

This appeal involves a dispute between Empire Fire & Marine Insurance Company ("Empire") and Guaranty National Insurance Company ("Guaranty") as to which of their policies affords primary coverage relative to the accident here under consideration. The district court granted summary judgment in favor of Empire, holding that the Interstate Commerce Commission ("ICC") endorsement attached to Guaran-

ty's policy makes Guaranty the primary insurer as a matter of law over any other insurer. In so holding, the district court expressed the view that our opinion in *Rodriguez v. Ager*, 705 F.2d 1229 (10th Cir. 1983) was controlling. We disagree.

The ICC endorsement does not establish automatic priority of the insurance policy to which it is attached, but rather serves only to negate limiting clauses that may appear in that policy. As modified by the endorsement, the policy still must be compared to all other relevant policies in order to determine, under traditional state insurance and contract law, the priorities among the policies. Although it appears on the record before us that this analysis would likely lead to the same conclusion reached by the district court that Guaranty's policy is the primary policy, the district court entered summary judgment for Empire on the ground that the mere existence of the ICC endorsement in Guaranty's policy made it primary over other policies as a matter of law. Therefore, the parties have not had the opportunity to submit evidence concerning a comparative analysis of the policies. Accordingly, we vacate the district court's decision and remand the case for further proceedings.

## I. FACTS

The underlying facts are not in dispute. Jennings Trucking Service, Inc. ("Jennings") is an interstate motor carrier licensed by the ICC to haul goods over authorized routes. Jennings is insured by Guaranty. Kris Knaus owns an independent trucking company, which owns and leases trucks and drivers to motor carriers, such as Jennings, for hauling goods over ICC certified routes. Knaus is insured by Empire.

On March 3, 1982, Knaus and Jennings entered into a lease agreement whereby Knaus provided Jennings with a Mack truck and a driver by the name of Billy Bellamy for use in Jennings' business.

Knaus retained ownership of the truck, and Bellamy remained his employee under the terms of the lease.

On June 27, 1984, Bellamy telephoned Jennings' dispatcher to ask if a hauling job was available. The dispatcher did not have a job available, so Bellamy proceeded to drive toward Jennings' dispatch yard to wait for a job. En route to the dispatch yard, Bellamy collided with an automobile driven by Christopher Gallagher. Gallagher died as a result of the accident.

Following the accident, Gallagher's estate threatened litigation against Knaus and its insurance carrier, Empire. Empire demanded that Guaranty assume the defense, but Guaranty rejected that demand. Empire thereafter negotiated a settlement with Gallagher's estate in the amount of $158,565.71. Empire brought this suit against Guaranty to recover the settlement amount. The district court granted summary judgment for Empire, holding that the ICC endorsement in Guaranty's policy makes Guaranty the primary insurer as a matter of law, and Guaranty therefore was obligated to reimburse Empire for the entire amount paid by Empire in settlement to the Gallagher estate.

## II. THE INSURANCE POLICIES

### A. *Empire's Policy*

Empire's policy with Knaus obligates Empire to pay all sums that Knaus is legally required to pay as damages for bodily injury or property damage resulting from the operation of an auto covered by the policy.[1] In addition to providing coverage for Knaus, the policy covers any other party "using with [Knaus'] permission a covered auto [Knaus] own[s]."[2] With respect to the allocation of liability among other insurance policies that also might be applicable, Empire's policy, as modified by the Truckers Coverage Endorsement, provides as follows:

### PART VI—CONDITIONS

---

1. Empire's policy defines "auto" as "a land motor vehicle, trailer, or semi-trailer designed for travel on public roads," which includes the Mack truck involved here.

2. Under this provision, Empire's policy appears to cover Bellamy, the driver of the Mack truck at the time of the accident.

B. OTHER INSURANCE—PRIMARY AND EXCESS INSURANCE PROVISIONS.

1. ... This policy's liability coverage is excess over any other collectible insurance for any covered auto while hired or borrowed from you by another trucker....[3]

2. Except as provided in Paragraph 1 above, this policy provides primary insurance for any covered auto you own and excess insurance for any covered auto you don't own.

3. When two or more policies cover on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the limit of our policy bears to the total of the limits of all the policies covering on the same basis.

### B. *Guaranty's Policy*

Guaranty's policy with Jennings obligates Guaranty to pay all sums that Jennings is legally required to pay as damages for bodily injury or property damages resulting from the use of a covered auto.[4] Guaranty's permissive user clause provides that "[a]nyone else is an insured while using with [Jennings'] permission any covered auto" hired or borrowed by Jennings.[5] The policy also covered the owner of covered autos that Jennings leases "while the covered auto is being used exclusively in [Jennings'] business, and is being used pursuant to operating rights granted to [Jennings] by a public authority."[6] (Guaranty's Policy, Part IV(D)(4).)

With respect to the allocation of liability among other insurance companies that also might be liable, Guaranty's policy provides:

PART VII—CONDITIONS

B. OTHER INSURANCE—PRIMARY AND EXCESS INSURANCE PROVISIONS.

1. This policy's liability coverage is primary for any covered auto while hired or borrowed by you and used exclusively in your business and pursuant to operating rights granted to you by a public authority....

....

3. Except as provided in Paragraphs 1 and 2 above, this policy provides primary insurance for any covered auto you own and excess insurance for any covered auto you don't own.

4. When two or more policies cover on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the limit of our policy bears to the total of the limits of all the policies covering on the same basis.

Because Jennings is an interstate carrier operating pursuant to an ICC certificate and authority, the following special endorsement, ICC form BMC 90,[7] is attached to the insurance policy provided by Guaranty:

The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended to assure compliance by the insured, within the limits stated herein, as a motor carrier of property, with Sections 29 and 30 of the Motor Carrier Act of 1980 and the

---

**3.** Without the Truckers Coverage Endorsement, Part VI(B)(1) would have provided, "For any covered auto you own this policy provides primary insurance." Although we assume that the Truckers Coverage Endorsement modifies this language, as reflected above, and makes the policy an excess coverage policy for purposes of this litigation, that issue has not been tried, nor have there been any findings below on the extent of Empire's coverage. We do not preclude consideration of the applicability of the Truckers Coverage Endorsement on remand.

**4.** Guaranty's policy defines "auto" to include the Mack truck here involved.

**5.** Under this provision, Guaranty's policy appears to cover Bellamy, the driver at the time of the accident. Guaranty argues on appeal that Bellamy was not covered under Guaranty's policy because, under state master and servant law, Jennings was not responsible for Bellamy at the time of the accident. This court rejected that argument in *Rodriguez v. Ager,* 705 F.2d 1229, 1236 (10th Cir.1983).

**6.** Under this provision, Guaranty's policy also appears to cover Knaus, although we do not preclude the parties from addressing this issue on remand.

**7.** *See* 49 C.F.R. § 1003.3.

rules and regulations of the Federal Highway Administration's Bureau of Motor Carrier Safety (Bureau) and the Interstate Commerce Commission (ICC).

In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. Such insurance as is afforded, for public liability, does not apply to injury to or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo. It is understood and agreed that *no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment,* within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured. However, all terms, conditions and limitations in the policy to which the endorsement is attached, shall remain in full force and effect as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the

policy except for the agreement contained in this endorsement.

(Emphasis added.)

The primary issue raised on appeal is whether the underlined language in the above-quoted endorsement makes Guaranty's policy primary as a matter of law over Empire's policy, which does not contain such an endorsement.

### III.   DISCUSSION

■   Federal courts have interpreted the effect of this ICC endorsement in at least three ways.   (1) The court below held that the endorsement makes the insurance policy to which it is attached primary as a matter of law over all other insurance policies that lack similar provisions. *Empire Fire & Marine Ins. Co. v. Guaranty Nat'l Ins. Co.,* D.C. No. 85–C–713–C (N.D.Okla. Dec. 19, 1986).   (2) Other courts have held that the endorsement only negates limiting provisions in the policy to which it is attached, such as an "excess coverage" clause, but does not establish primary liability over other policies that are also primary by their own terms. *American Gen. Fire & Casualty Co. v. Truck Ins. Exch.,* 660 F.Supp. 557, 569 (D.Kan.1987).   (3) Other courts have held that the endorsement applies only to situations in which a claim is being asserted by a shipper or a member of the public, and that the endorsement does not apply when allocating liability among insurance carriers. *E.g., Carter v. Vangilder,* 803 F.2d 189, 191–92 (5th Cir.1986); *Transport Indem. Co. v. Paxton Nat'l Ins. Co.,* 657 F.2d 657, 659 (5th Cir. 1981), *cert. denied,* 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 692 (1982); *Carolina Casualty Ins. Co. v. Underwriter's Ins. Co.,* 569 F.2d 304, 313 (5th Cir.1978).

Because these interpretations compel such dramatically different results, yet each has jurisprudential support, it is important that we clarify the Tenth Circuit's position on this issue.[8]   We adopt the sec-

---

**8.** The following hypothetical illustrates the different results that would be reached under each of these three interpretations.   Assume that an owner-lessor of a truck has an insurance policy which provides that it is "primary," and that the carrier-lessee of the truck has an insurance policy that provides that it is "excess."   Assume also that the lessee's policy has an ICC endorsement identical to the one in this case and that the lessor's policy has no such endorsement.   Finally, assume that the truck was involved in an accident which led to damages within the individual policy limits of both the lessor's and lessee's insurance policies.

ond approach listed above and hold that the ICC endorsement negates any inconsistent limiting provisions in the insurance policy to which it is attached, regardless of whether a shipper or a member of the public is involved in the dispute or whether the dispute is among insurance companies. We do not, however, expand the effect of the ICC endorsement to make any policy to which it is attached primary over other policies which are also primary by their own terms but which lack an ICC endorsement. In reaching this result, we rely on legislative history, relevant ICC regulations, and the language of the endorsement itself. We also consider the diverse precedent concerning the issue.

## A. *Federal Statutes and Regulations*

Although the history of the relevant federal statutes and ICC regulations does not expressly guide the disposition of this case, it does lend support to our result. Therefore, a brief overview of the history of the industry and regulations is in order.

In the past, the use by truckers of leased or borrowed vehicles led to a number of abuses that threatened the public interest and the economic stability of the trucking industry. *See, e.g., American Trucking Ass'ns v. United States,* 344 U.S. 298, 304–05, 73 S.Ct. 307, 311–12, 97 L.Ed. 337 (1953). In some cases, ICC-licensed carriers used leased or interchanged vehicles to avoid safety regulations governing equipment and drivers. *Id.* at 305, 73 S.Ct. at 312. In other cases, the use of non-owned vehicles led to public confusion as to who was financially responsible for accidents caused by those vehicles. *See, e.g., Mellon Nat'l Bank & Trust Co. v. Sophie Lines, Inc.,* 289 F.2d 473, 477 (3d Cir.1961).

In order to address these abuses, Congress amended the Interstate Commerce Act to allow the ICC to prescribe regulations to insure that motor carriers would be fully responsible for the operation of vehicles certified to them. 49 U.S.C. § 304(e) (1956). This section was revised and reenacted in 1978. *See* 49 U.S.C. § 11107; *see also* 49 U.S.C. § 10927. In response to this mandate, the ICC promulgated regulations requiring that every lease entered into by an ICC-licensed carrier must contain a provision stating that the authorized carrier maintain "exclusive possession, control, and use of the equipment for the duration of the lease," and "assume complete responsibility for the operation of the equipment for the duration of the lease." 49 C.F.R. § 1057.12(c). Further, the ICC requires that all ICC-certified carriers maintain insurance or other form of surety "conditioned to pay any final judgment recovered against such motor carrier for bodily injuries to or the death of any person resulting from the negligent operation, maintenance, or use of motor vehicles" under the carrier's permit. 49 C.F.R. § 1043.1(a).

To assure compliance with this requirement, the ICC developed a form endorsement to be included in insurance policies of carriers who use leased vehicles to transport property under ICC certificate. *See* 49 C.F.R. § 1003.3 (B.M.C. 90 (Rev.1982), Endorsement for Motor Carrier Policies of Insurance for Automobile Bodily Injury and Property Damage Liability under 49 U.S.C. § 10927). Thus, the ICC endorsement that is the subject of this appeal had its origin in the ICC's desire that the public be adequately protected when a licensed

---

Under the first interpretation, the lessee's insurance company would be solely liable because the ICC endorsement would make that policy primary as a matter of federal law over all other policies not containing a similar endorsement, regardless of the primary coverage language in the lessor's policy.

Under the second interpretation, both insurance companies would share pro rata in the liability because the ICC endorsement would merely have the effect of negating the "excess coverage" limitations contained in the lessee's policy. Therefore, both of the policies would be

primary policies and, under customary pro rata sharing provisions, both insurers would share in the liability.

Under the third interpretation, the endorsement would be considered inconsequential in allocating risk between the insurance companies. Although the lessee's policy would be considered a primary policy insofar as the public and shippers are concerned, it would remain an excess policy for purposes of allocating liability between the insurance companies, and therefore the lessor's insurance company, as the only primary insurer, would be solely liable.

carrier uses a leased vehicle to transport goods pursuant to an ICC certificate. *Cf. Transamerican Freight Lines, Inc. v. Brada Miller Freight Sys's Inc.*, 423 U.S. 28, 34, 96 S.Ct. 229, 232, 46 L.Ed.2d 169 (1975); *Rodriguez v. Ager*, 705 F.2d 1229, 1232 (10th Cir.1983).

**B.** *Language of the ICC Endorsement*

■ The ICC endorsement provides in relevant part:

It is understood and agreed that *no condition, provision, stipulation, or limitation* contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, *shall relieve* the company from liability or from the payment of any final judgment, within the limits of liability herein described.

(Emphasis added.)

Nothing in the language of this endorsement purports to make the insurance policy to which it is attached primary over all other primary insurance policies. A straightforward reading of the language suggests only that it negates any clauses in the body of the policy to which it is attached that would have the effect of limiting that insurance carrier's liability. That is, it *deletes* limiting clauses in the policy to which it is attached, but it does not *create* new, additional obligations in the policy, nor does it purport to limit or delete clauses in *other* policies issued by other insurance companies that may also have contractually assumed primary liability for the risk involved.

■ An "excess coverage" clause is a "condition" or "limitation" that could "relieve the company of liability." Thus, an excess coverage clause is the kind of limitation that the ICC endorsement is designed to render ineffective. Once the ICC endorsement removes the "excess coverage" clause, the policy is treated as affording primary coverage. *See Argonaut Ins. Co. v. National Indem. Co.*, 435 F.2d 718, 720 (10th Cir.1971); *American Gen. Fire & Casualty Co. v. Truck Ins. Exch.*, 660 F.Supp. 557, 567 (D.Kan.1987). The ICC endorsement cannot, however, nullify the effect of other policies that are also pri-

mary by their own terms. To hold otherwise would grant the insurers who issued those policies a windfall. We find no authority to suggest that the ICC intended to allow other insurance companies to escape their contractual obligations to provide additional primary coverage, for which they presumably collected premiums, merely because of the fortuity that another insurance policy involved in the matter contains an ICC endorsement.

**C.** *Tenth Circuit Precedent*

The district court concluded that our decision in *Rodriguez v. Ager*, 705 F.2d 1229 (10th Cir.1983), required the holding that Guaranty's ICC endorsement makes Guaranty the primary insurer over all other insurers as a matter of law, regardless of the provisions in Empire's policy. In this regard, the district court is mistaken.

In *Rodriguez*, an interstate motor carrier leased a truck and driver for use in its ICC-licensed trucking business. The truck bore the lessee's insignia at the time it was involved in a fatal accident, even though the truck and driver were engaged in business totally unrelated to the lessee's business. The family of the decedent, who was driving the automobile at the time it collided with the leased truck, sued the truck owner, the driver, and the lessee. The issue was whether the decedent's relatives could recover against the lessee even though the truck was not being driven on his behalf at the time of the accident. We held that the lessee was liable to the decedents' family because, as a matter of law, ICC regulations require the lessee to be responsible for all equipment leased to it during the term of the lease. *Id.* at 1236.

*Rodriguez* is instructive on the issue of a lessee's responsibilities to injured parties under ICC regulations, but it is not relevant to the issue of how liability should be allocated between two insurance companies, both of which arguably have insured the same event. *Rodriguez* did not involve insurance companies, nor did it address the effect of an ICC endorsement on the allocation of risk among insurance companies.

Therefore, it was error to hold that *Rodriguez* is controlling in this case.

There are, however, three other cases in which the Tenth Circuit has considered the effect of an ICC endorsement on the allocation of risk among multiple insurers, *Argonaut Ins. Co. v. National Indem. Co.*, 435 F.2d 718 (10th Cir.1971); *Hagans v. Glens Falls Ins. Co.*, 465 F.2d 1249 (10th Cir. 1972); and *Carolina Casualty Ins. Co. v. Transport Indem. Co.*, 488 F.2d 790 (10th Cir.1973). Although other circuits have occasionally interpreted those cases as establishing the proposition that an ICC endorsement makes that policy primary as a matter of law over all other policies without such an endorsement, that interpretation is not warranted.[9]

In *Argonaut Ins. Co. v. National Indem. Co.*, 435 F.2d 718 (10th Cir.1971), the earliest Tenth Circuit case addressing this issue, the lessor's and the lessee's insurance policies both contained identical "excess coverage" provisions. The lessee's policy also contained an ICC endorsement similar to the one at issue here. This court held that the provisions of the ICC endorsement attached to the lessee's insurance policy negated inconsistent provisions in the body of the policy, such as the "excess coverage" limitation, and thereby converted that policy into a primary policy. *Id.* at 720. When the lessee's policy, thus modified, was compared with the lessor's policy, which remained "excess," the lessee's insurer obviously bore the ultimate liability.

The holding in *Argonaut* is fully consistent with our result here. We hold that the ICC endorsement in Guaranty's policy negates any limiting language in Guaranty's policy that might otherwise be applicable, thereby making Guaranty's policy primary.[10] Guaranty's policy, as modified, must then be compared with the relevant provisions in Empire's policy to determine the ultimate allocation of liability.

Our holding in *Hagans v. Glens Falls Ins. Co.*, 465 F.2d 1249 (10th Cir.1972), does not compel a different result. *Hagans* also involved a dispute between two insurance carriers over the allocation of liability when both policies arguably covered the event in question. The issue, however, was whether the lessee's insurance company could rely on indemnification language *in the lease between the lessor and the lessee* to limit its liability. We held that it could not. We held that the liability of the lessee's insurer had to be measured by the terms of its own policy, and not by the terms of a lease to which it was not even a party. *Id.* at 1252. The opinion contains dicta that could be read as interpreting *Argonaut* as holding that an ICC endorsement always makes that policy supreme over all other policies as a matter of law.[11] However, such an overly broad reading of *Argonaut* was not necessary to the resolution in *Hagans*, where the parties *conceded* that the lessee's policy would be primary over the lessor's policy if the lessee could not escape liability through the indemnification provi-

---

9. *See Gaskin v. Jowers*, 775 F.2d 621, 625 (5th Cir.1985) ("the Tenth Circuit arguably interprets the lessee's coverage to be primary as a matter of law; the lessor's insurance provides excess coverage as a result of that Circuit's construction of the ICC regulations"); *Carolina Casualty Ins. Co. v. Underwriter's Ins. Co.*, 569 F.2d 304, 312 (5th Cir.1978) ("Even if we assume *arguendo* ... that in this trilogy [*Argonaut, Hagans,* and *Carolina v. Transport*] the Tenth Circuit is saying that such an endorsement makes insurance coverage primary *in all circumstances and for all purposes* as a matter of law, we decline to follow such a rule." (Emphasis added)), *cert. denied,* 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 692 (1982).

10. As noted above, Guaranty's policy appears to be primary even without regard to the endorse-

ment. If that is so, then the endorsement would have no effect on the comparison of the two policies because there would be no limiting language in Guaranty's policy for the endorsement to negate.

11. The language in *Hagans* is as follows:

The teaching of *Argonaut* is that because of the ICC endorsement in the policy issued Driveaway by Argonaut, Argonaut was the primary insurer as a matter of law, and such holding was obviously grounded on public policy.... Hence, we too assume that the policy issued Far–Go by Glens Falls contained the ICC endorsement. Such being the case, then, under *Argonaut,* Glens Falls is the primary insurer.

465 F.2d at 1252.

sion in the lease. *Id.* at 1251. Thus, the effect of the ICC endorsement was not before the court as a disputed issue.

*Carolina Casualty Ins. Co. v. Transport Indem. Co.*, 488 F.2d 790 (10th Cir. 1973), involved a similar dispute between two insurance companies, *both* of which had identical ICC endorsements. Rather than focusing on the endorsements, the court analyzed the relationships among the insured parties, the driver, and the terms of the insurance policies. To avoid circuity of action, we simply imposed liability on Carolina Casualty, the lessee's insurance company, because, after the resolution of all intervening actions and after consideration of the various legal duties that the parties owed to each other, Carolina Casualty ultimately would have been liable.[12] *Id.* at 794. The ICC endorsements in both policies were not determinative because they effectively neutralized each other.

These Tenth Circuit cases should not be read as broadly as some courts have done to establish a rule that an ICC endorsement always makes the policy to which it is attached supreme over all other policies as a matter of law. *Argonaut* simply stands for the proposition that an ICC endorsement should be read to negate inconsistent limiting language in the underlying policy. It did not hold that a policy with an ICC endorsement should be expanded to assume primary liability over all other policies that are also primary by their terms. *Hagans* merely refused to allow an insurance company to rely on the terms of a contract to which it was not a party. *Carolina Casualty v. Transport* was decided on a "circuity of action" theory rather than on the meaning of the ICC endorsements. Our reading of Tenth Circuit precedent persuades us that in the case before us, although Guaranty's policy is rendered *a* primary policy by the ICC endorsement, it does not preempt the need to compare coverage under that policy, as amended, with coverage under the Empire policy.

D. *Brada Miller*

In 1975, after the Tenth Circuit decided the cases discussed above, the United States Supreme Court decided *Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems, Inc.*, 423 U.S. 28, 96 S.Ct. 229, 46 L.Ed.2d 169 (1975). *Brada Miller* did not address the effect of an ICC endorsement. Rather, the issue was the effect to be given to an indemnification agreement in a lease between Brada Miller, as lessor, and Transamerican, as lessee, whereby Brada Miller indemnified Transamerican for any claims arising out of Brada Miller's negligence.

Brada Miller argued that the indemnification agreement was invalid because it contravened the ICC's "control and responsibility" requirement of 49 C.F.R. § 1057.3(a) (1975), which required Transamerican, as an ICC-licensed trucker, to retain control and responsibility for the equipment and to be liable to the public for liability in connection with the use of the equipment. The Court rejected this argument and found that the "control and responsibility" requirements were "not in conflict and that the indemnification clause does not impinge upon the requirements of the lease and of § 1057.3(a) that operational control and responsibility be in the lessee." *Id.* at 38, 96 S.Ct. at 234. The Court held that the indemnification clause did not affect the lessee's responsibility to the public because it involved only the relationship between the insureds and their insurers, and therefore it was valid. *Id.* at 39, 96 S.Ct. at 234–35. In reaching its conclusion, the Court stated:

> Although one party is required by law to have control and responsibility for conditions of the vehicle, and to bear the consequences of any negligence, the party responsible in law to the injured or damaged person may seek indemnity from the party responsible in fact.

*Id.* at 40, 96 S.Ct. at 235.

*Brada Miller* stands for the proposition that the purpose of the ICC regulations is

---

**12.** Guaranty suggests a similar approach here, urging us to decide ultimate liability based on the recoupment provisions in the endorsement and to declare ultimate liability on Empire to

avoid needless circuity of action. We decline that invitation, as did the district court, because the recoupment provision involves parties not present in this lawsuit.

to protect the public and shippers, and that so long as the public and shippers are protected, parties can allocate risks among themselves in any manner they wish. Because the purpose of the ICC endorsement is similarly to protect the public and shippers, some courts have relied on *Brada Miller* as authority for the proposition that the ICC endorsement should be given effect *only* in the context of litigation involving and affecting the rights of the public and shippers, and that it should not be given effect in litigation between two insurance companies as to how they should allocate risk among themselves. *See, e.g., Carter v. Vangilder*, 803 F.2d 189, 192 (5th Cir.1986). However, the correct reading of *Brada Miller*, in our view, is not that certain provisions in a contract be given only selective application, but rather that parties may enter into contractual agreements allocating ultimate liability among themselves that will be enforced so long as such agreements do not adversely affect the rights of the public and shippers.

This is precisely the result that we reach here. By relying on the ICC endorsement to delete limiting language in the lessee's underlying policy, the public and shippers are protected. Having determined that the public and shippers are protected, the parties are then free, as among themselves, to allocate risk however they choose. Our task is simply to look at the insurance policies, as modified by relevant endorsements, and to make a determination under contract law as to how the parties have, in fact, chosen to allocate the risk.[13]

### E. *Precedent from Other Courts*

No consensus can be derived from cases in other circuits because support can be found for each of the interpretations discussed at the beginning of this opinion. A brief synopsis of the law in other circuits will illustrate the current state of confusion concerning this issue.

The Sixth Circuit and one Fifth Circuit case have cited with approval the Tenth Circuit cases of *Argonaut Ins. Co. v. Nat'l Indem. Co.*, 435 F.2d 718 (10th Cir.1971), and *Hagans v. Glens Falls Ins. Co.*, 465 F.2d 1249 (10th Cir.1972), for the proposition that, as a matter of law, an ICC endorsement makes the policy to which it is attached a primary policy. However, the Sixth and Fifth Circuits relied on other factors to determine how to allocate ultimate liability among two or more primary policies. *See Indiana Ins. Co. v. Carolina Casualty Co.*, 510 F.2d 490, 494 (6th Cir. 1974) (relying on avoidance of circuity of actions to assess ultimate liability); *Empire Indem. Ins. Co. v. Carolina Casualty Ins. Co.*, 838 F.2d 1428, 1432 (5th Cir.1988) (determining that when two policies contain an ICC endorsement, the policy covering the entity that held the ICC certificate under which the truck was being operated at the time of the accident was ultimately liable).

Other Fifth Circuit cases, however, have held that the endorsement should not be considered at all in disputes between insurance companies. *See Carter v. Vangilder*, 803 F.2d 189, 191 (5th Cir.1986) ("Under federal law, an ICC endorsement does not require that an excess coverage clause of an insurance policy be read out of the policy, resulting in that policy then providing primary coverage vis-a-vis another insurance company."); *Transport Indem. Co. v. Paxton Nat'l Ins. Co.*, 657 F.2d 657, 659 (5th Cir.1981) ("ICC policy factors are frequently determinative where protection of a member of the public or a shipper is at

---

**13.** We recognize that the prologue language of the endorsement states that the endorsement is intended "to assure compliance by the assured" with Sections 29 and 30 of the Motor Carrier Act. Undoubtedly, the purpose of the endorsement was to provide financial protection to members of the public and to shippers. That fact, however, does not lead to the conclusion that the ICC endorsement modifies the policy only vis-a-vis the public and shippers, and not vis-a-vis insurance companies. Such a chameleon-like quality of a clause in a commercial contract that changes character depending on who is seeking to apply it should not be favored unless compelled by the language of the instrument. The ICC endorsement is not "written in special ink which appears for cases involving the public and disappears in cases involving other insurers. Here, the clause is physically attached to the policy and must be given effect." *Transport Indemn. Co. v. Carolina Casualty Ins. Co.*, 133 Ariz. 395, 403, 652 P.2d 134, 142 (1982).

stake, but those factors cannot be invoked by another insurance company which has contracted to insure a specific risk and which needs no equivalent protection.") (quoting *Carolina Casualty Ins. Co. v. Underwriter's Ins. Co.*, 569 F.2d 304, 312 (5th Cir.1978)), *cert. denied*, 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 692 (1982).

The Third and Seventh Circuits likewise appear to disregard the endorsement language in allocating responsibility between insurance companies. *See Carolina Casualty Ins. Co. v. Insurance Co. of N. Am.*, 595 F.2d 128, 138 (3d Cir.1979) (rejecting conclusion that ICC endorsement in policy rendered coverage primary); *Occidental Fire & Casualty Co. of N.C. v. International Ins. Co*, 804 F.2d 983, 986 (7th Cir. 1986) (same); *Travelers Ins. Co. v. Transport Ins. Co.*, 787 F.2d 1133, 1140 (7th Cir.1986) (ICC factors, such as an ICC endorsement, are not relevant in disputes between insurance companies).

Cases from other circuits may appear at first blush to be contrary to the position advanced here, but in fact do not address the precise issue before us. *See Grinnell Mut. Reinsurance Co. v. Empire Fire & Marine Ins. Co.*, 722 F.2d 1400 (8th Cir. 1983) (case did not involve ICC endorsement), *cert. denied* 466 U.S. 951, 104 S.Ct. 2155, 80 L.Ed.2d 540 (1984); *Occidental Fire & Casualty Co. of N.C. v. Brocius*, 772 F.2d 47 (3d Cir.1985) (same); *Gaskin v. Jowers*, 775 F.2d 621, 625–26 (5th Cir.1985) (same); *National Mut. Ins. Co. v. Liberty Mut. Ins. Co.*, 196 F.2d 597 (D.C.Cir.1952) (endorsement not applicable because driver/owner was not an insured under the policy).

None of these cases advances the precise conclusion we reach here, but we follow

them insofar as they hold that an ICC endorsement attached to an insurance policy does not absolve the liability of another insurer that would otherwise provide primary coverage by its own terms. We decline to follow these cases, however, insofar as they disregard the effect of an ICC endorsement on the policy to which it is attached when the public or a shipper is not involved in the dispute.

### F. *American General*

Our holding comports with a recent case from the United States District Court for the District of Kansas, *American Gen. Fire & Casualty Co. v. Truck Ins. Exch.*, 660 F.Supp. 557 (D.Kan.1987) (O'Connor, J.). *American General* is helpful to our analysis because the operative facts there were nearly identical to those here. After a detailed analysis of numerous cases that have grappled with the effect of an ICC endorsement, the court there addressed *Argonaut Ins. Co. v. National Indem. Co.*, 435 F.2d 718 (10th Cir.1971), and *Hagans v. Glens Falls Ins. Co.*, 465 F.2d 1249 (10th Cir.1972), giving them the precise interpretations that we believe are faithful to their factual circumstances.[14] *American General*, 660 F.Supp. at 564.

In *American General*, the court held, in reference to the lessee's policy that contained the ICC endorsement, that "the inclusion of the endorsement modifies inconsistent terms in the insurance policy." *Id.* at 564. The court further held that public policy does not require "that insurers of truck owners be absolved from the risks they voluntarily assumed solely because the vehicle was leased to an interstate carrier." *Id.* at 565. The court's

---

**14.** With respect to *Argonaut*, the court said:

Therefore, reading the case in light of its particular facts, we believe that the court only intended to hold: (1) that the inclusion of the endorsement modifies inconsistent terms in the insurance policy; and (2) that *under the terms of both policies* involved, Argonaut was a primary insurer and National's coverage was excess only.

660 F.Supp. at 564 (emphasis added).

With respect to *Hagans,* the court said:

Regrettably, the broad language of *Argonaut* was used by the Tenth Circuit in *Hagans.* Yet in *Hagans,* the carrier's insurer, Glens Falls, *conceded* that it was the primary insurer. Glens Falls, however, attempted to evade its responsibilities as the primary insurer based on an indemnification clause found in the lease agreement. The court merely refused to alter Glens Falls' responsibilities under its policy because of the provision in the lease agreement to which it was not a party. *Id.* (citations omitted).

conclusion is the same as the one that we advance here:

> [T]he court finds that federal statutes and regulations pertaining to an interstate carrier's use of nonowned equipment do not render the carrier or its insurer *exclusively* liable for personal injuries or property damage sustained in an accident involving such equipment. Instead, federal law, as interpreted by the Tenth Circuit, imposes liability on all insurers who are obligated to provide some type of coverage for damage pursuant to the terms of their policies and any endorsements thereto. Under federal law, the insurer of an ICC-licensed carrier is required to provide primary coverage for any final judgment obtained against the carrier. However, the mere fact that an interstate carrier is involved does not absolve other insurers from their obligations under other policies which are applicable to the claims.

*Id.* at 569.

We are in complete agreement with the district court in *American General,* and adopt its reasoning:

> [T]here is no reason that state laws or private agreements should not be able to allocate *ultimate* financial responsibility in such a situation. Nor does public policy dictate that insurers of truck owners be absolved from risks they voluntarily assumed solely because the vehicle was leased to an interstate carrier.

*Id.* at 565 (citations omitted). Similarly, Empire may not escape liability that would otherwise be primary simply because Guaranty's policy contains an ICC endorsement.

### IV. CONCLUSION

In summary, we hold that the effect of the ICC endorsement in Guaranty's policy is to negate limiting language in the body of the policy, including any applicable "excess coverage" clause, but that the endorsement does not makes Guaranty's policy necessarily primary and supreme over Empire's policy. Rather, once limiting language is read out of Guaranty's policy, the two policies then must be compared pursuant to traditional state insurance and contract law principles to determine how liability should be allocated. Accordingly, we VACATE the summary judgment and REMAND for a determination of how the risks should be allocated between Guaranty and Empire when all the provisions of both policies, including the ICC endorsement, are considered.