**Elvina HAMM, et al., Plaintiffs,**

v.

**CANAL INSURANCE COMPANY, Defendant.**

**No. 1:97CV00729.**

United States District Court, M.D. North Carolina, Durham Division.

June 18, 1998.

Thomas Anderson, Pilot Mountain, NC, for Plaintiffs.

Laura J. Wetsch, Jordan, Price, Wall, Gray, & Jones, L.L.P., Raleigh, NC, for Defendant.

## MEMORANDUM OPINION

BEATY, District Judge.

Plaintiffs initiated this declaratory judgment action against Defendant, Canal Insurance Company, requesting that the Court determine whether Defendant's potential liability exceeds the stated policy limits of $1 million as a result of claims that may arise out of a four vehicle accident, involving a vehicle owned by Defendant's insured, Virginia Hiway Express. Plaintiffs contend that Defendant's monetary policy limitation is not controlling in this case based upon federal statutes and regulations which govern Defendant's financial obligations in the event Plaintiffs successfully obtain final judgments against Defendant's insured.

The matter is currently before the Court on Defendant's Motion for Judgment on the Pleadings [Document # 16] pursuant to Fed. R.Civ.P. 12(c). For the reasons stated herein, the Court will allow Defendant's motion and enter judgment on the pleadings for Defendant based upon the Court's conclusion that Defendant's total potential liability as a result of the single accident described in the Complaint is limited to $1 million.

## I. Factual Background

The parties do not dispute the essential facts of this case. Plaintiffs accept the statement of the facts as set out in Defendant's

memorandum in support of its Motion for Judgment on the Pleadings. In summary, the parties agree that the accident took place on July 8, 1995 near Salisbury, North Carolina. Tragically, a Virginia Hiway Express truck, traveling in the southbound lane of Interstate 85 near its intersection with U.S. Highway 52, struck the rear of a vehicle being driven by Mary Lee Wilson and knocked it onto the shoulder of the highway. The Virginia Hiway Express truck then collided with the vehicle being operated by the Plaintiff, Janet Louise Hamm ("Hamm"), forcing her vehicle into the rear of a flat-bed truck being operated by Amos Lee Ofair ("Ofair") in which other Plaintiffs were passengers. The Virginia Hiway Express truck then struck the Ofair vehicle in the right rear section and pushed it into the grassy median. (Pls.' Compl. ¶¶ 11–18.) As a result of the accident, four occupants of Plaintiffs' vehicles were killed and three suffered severe injuries. Two separate civil actions for personal injuries and wrongful death, Case Nos. 4:96CV1019 and 4:97CV182, have been filed by Plaintiffs in the United States District Court for the Middle District of North Carolina against Defendant's insured, Virginia Hiway Express, and the registered owner of the truck, Glen R. Pointer. Based upon these undisputed facts, the parties agree that the matter is before the Court on a question of law which can be resolved pursuant to Defendant's Motion for Judgment on the Pleadings.

## II. Standard of Review

Pursuant to Federal Rule of Civil Procedure 12(c), "after the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c). When reviewing a Rule 12(c) motion the court must construe the allegations in the complaint in the light most favorable to the non-moving party. *Bruce v. Riddle,* 631 F.2d 272, 273 (4th Cir.1980). A district court may grant a motion for judgment on the pleadings when no genuine issues of material fact remain and the case can be decided as a matter of law. *King v. Gemini Food Servs., Inc.,* 438 F.Supp. 964, 966 (E.D.Va.1976), *aff'd on other grounds,* 562 F.2d 297 (4th Cir.1977), *cert.*

*denied,* 434 U.S. 1065, 98 S.Ct. 1242, 55 L.Ed.2d 766 (1978); *see Jadoff v. Gleason,* 140 F.R.D. 330, 331 (M.D.N.C.1991).

## III. Discussion

■ As previously stated, the facts are not in dispute. Defendant therefore argues that its potential financial obligation to Plaintiffs is limited because of the terms of the insurance policy issued to its insured, Virginia Hiway Express. In support of this position, Defendant offers as evidence the declarations page of the policy issued by Defendant to Virginia Hiway Express which clearly establishes a limit on Defendant's liability of $1 million per occurrence. (Pls.' Compl., Ex. A.) Defendant also points to the section of the policy labeled as the "Single Limit of Liability Endorsement" as additional evidence of the limits of its potential liability. (*Id.*) The "Single Limit of Liability Endorsement" provides that:

> [r]egardless of the number of (1) insureds under this policy, (2) persons or organizations who sustain bodily injury or property damage, (3) claims made or suits brought on account of bodily injury or property damage or (4) automobiles to which this policy applies, the company's liability is limited as follows: [t]he limit of liability stated in the schedule of the policy as applicable to "each occurrence" is the total limit of the company's liability for all damages because of bodily injury, including damages for care and loss of services....

(*Id.*) The Court finds that all of the references to a monetary limit within the policy establish a policy limit of $1 million. Notwithstanding the policy language contained within either the declarations page or the "Single Limit of Liability Endorsement," Plaintiffs contend that Defendant's potential liability is greater in this case because the language of the policy conflicts with the applicable federal statutory law which regulates the interstate transportation of goods. Plaintiffs contend that their position is supported by the Motor Carrier Act of 1980, as amended in 49 U.S.C. § 13906(a), which promulgated security requirements for federal motor carriers. It has been stated that:

[a]ccording to 49 U.S.C. § 10927(a)(1), the ICC may not issue a certificate of public interest, convenience, and necessity to a carrier out of compliance with financial responsibility regulations issued by the Secretary under § 30 of the Motor Carrier Act of 1980, Pub.L. 96–296, 94 Stat. 820. Section 30 and the implementing regulations, 49 C.F.R. Part 387, require all truckers to have insurance that will reimburse victims of accidents up to specified limits— now $750,000 for ordinary cargo, $1 million for shipments of oil and hazardous waste, and $5 million for shipments of explosives, radioactive material, and poison gas. 49 C.F.R. § 387.9. The Secretary has devised a standard form of endorsement for insurance policies that complies with the regulations. 49 C.F.R. § 387.15. Every insurer must use this endorsement or equivalent language. By this endorsement the insurer promises to pay the full judgment up to the regulatory minimum.

*American Inter–Fidelity Exch. v. American Re–Insurance Co.,* 17 F.3d 1018, 1021 (7th Cir.1994) (citations omitted). The specific statutory reference which Plaintiffs rely upon to support their position provides as follows:

(a) Motor carrier requirements.—

(1) Liability insurance requirements.— The Secretary may register a motor carrier under section 13902 only if the registrant files with the Secretary a bond, insurance policy, or other type of security approved by the Secretary, in an amount not less than such amount as the Secretary prescribes pursuant to, or as is required by, sections 31138 and 31139, and the laws of the State or States in which the registrant is operating, to the extent applicable. *The security must be sufficient to pay, not more than the amount of the security, for "each final judgment" against the registrant for bodily injury to, or death of, an individual resulting from the negligent operation, maintenance, or use of motor vehicles, or for loss or damage to property* (except property referred to in paragraph (3) of this subsection), or both. A registration remains in effect only as long as the registrant continues to satisfy the security requirements of this paragraph.

49 U.S.C. § 13906(a) (1996) (formerly 49 U.S.C. § 10927) (emphasis added by Plaintiffs).

As previously indicated, in order to assure compliance with the federal requirement for mandatory financial security, the Interstate Commerce Commission ("ICC") developed a form endorsement, specifically referred to as the MCS–90 endorsement, which was required to be a part of insurance policies of carriers who leased vehicles for hire in order to transport property under an ICC certificate. The actual language of the MCS–90 endorsement included in the policy of Defendant's insured, Virginia Hiway Express, mirrors the Motor Carrier Act and provides that:

In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, *within the limits of liability described herein,* any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere.

. . . .

It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, *within the limits of liability herein described,* irrespective of the financial condition, insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy,

and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

. . . .

The limits of the company's liability for the amount prescribed in this endorsement apply separately to each accident and any payment under this policy because of any one accident shall not operate to reduce the liability of the company for the payment of final judgments resulting from any other accident.

The policy to which this endorsement is attached provides primary or excess insurance, as indicated by "X", for the limits shown:

X—This insurance is primary and the company shall not be liable for amounts in excess of $1,000,000 CSL for each accident.

(Pls.' Compl., Ex. A) (emphasis added). The language cited from the policy in this case is the same language that appears in the illustration of an MCS–90 endorsement form within the regulations. *See* 49 C.F.R. § 387.15. It is also noteworthy that the only difference between the MCS–90 endorsement attached to Defendant's policy and the declarations page of the policy is that the declarations clause states that the limits of liability for Defendant is $1 million per occurrence, while the MCS–90 endorsement in this case provides for a limit of liability of "$1,000,000 CSL for each accident." Plaintiffs, however, request that the Court read the MCS–90 endorsement in this case to require that Defendant's potential liability for the July 8, 1995 accident go beyond the limits set out in both the declarations page of the policy and

the MCS–90 endorsement. Plaintiffs point to specific portions of the statute and the MCS–90 endorsement to reach this position. Plaintiffs, for the purpose of their argument, place great emphasis on the following portions of the Motor Carrier Act of 1980:

> The security must be sufficient to pay, *not more than the amount of the security,* for "each final judgment" against the registrant for bodily injury to, or death of, an individual resulting from the negligent operation, maintenance, or use of motor vehicles, or for loss or damage to property.

49 U.S.C. § 13906(a)(1) (emphasis added). Plaintiffs also emphasize a similar section from the MCS–90 endorsement which was part of the policy Defendant issued to its insured, Virginia Hiway Express, which reads as follows:

> the insurer (the company) agrees to pay, *within the limits of liability described herein,* any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial requirements of Sections 29 and 30 of the Motor Carrier Act of 1980.

(Pls.' Compl., Ex. A) (emphasis added). Based upon these specific references, Plaintiffs argue that the statute and the MCS–90 endorsement obligate Defendant to pay at least the minimum statutory security for "each final judgment" or "any final judgment" that may arise as a result of the separate claims asserted by any of the nine Plaintiffs involved in the underlying tort action against Defendant's insured, Virginia Hiway Express.[1] Defendant disagrees with

---

1. In support of this interpretation of the statute and the MCS–90 endorsement, Plaintiffs submit the affidavit of H. James Balcom, a licensed insurance broker who, at the time of the affidavit, was President of Corporate Risk Advisors–Managers, Inc., a risk management consulting firm located in Boston, Massachusetts. However, in the Reply Brief in Support of Defendant's Motion for Judgment on the Pleadings, Defendant requests that the Court disregard and not consider the Balcom affidavit on the basis that "the substantive portions of the Balcom affidavit are not factual in nature, but rather are statements of Balcom's opinion on how the Court should interpret the applicable federal statutes

and regulations." (Def.'s Reply Br. in Supp. of Mot. for J. on the Pleadings at 2.) Upon a review of Balcom's affidavit, the Court finds that Balcom's affidavit indeed goes beyond providing factual statements and offers his conclusions as to the application of the statute and legal effect of the MCS–90 endorsement, which Plaintiffs ask this Court to accept. The Court will therefore disregard Balcom's affidavit as being determinative of any issues before the Court. However, to the extent that Plaintiffs use language from the affidavit in order to make their Response to Defendant's Motion for Judgment on the Pleadings, the Court will view Balcom's affidavit as

this position and contends that, pursuant to both the liability limits declared in the policy and the MCS–90 endorsement issued to Defendant's insured, "a liability carrier's maximum potential exposure for all claims arising out of a single accident, under a policy with a combined single limit of $1 million issued to an interstate motor carrier of property, is limited to a total of $1 million regardless of the number of claimants and regardless of the total aggregate amount of claims that arise out of the accident." (Def.'s Mem. in Supp. of Mot. for J. on the Pleadings at 4.) Defendant further argues that the $1 million coverage in this case is more than the statutory minimum security requirement of $750,-000. *See* 49 C.F.R. §§ 387.7(a) and 387.9. Based upon a reading of 49 U.S.C. § 13906(a), the MCS–90 endorsement, and the case authority discussed herein, the Court agrees with Defendant's contention that the total potential liability for any and all claims resulting from the single accident on July 8, 1995 is limited to $1 million.

■ This Court finds that the language of both the statute and the MCS–90 endorsement very clearly describes Defendant's obligations as an insurer of a motor carrier in interstate commerce. With respect to the statute, it provides that "the security must be sufficient to pay, *not more than the amount of the security.*" 49 U.S.C. § 13906(a)(1) (emphasis added). The clear meaning of this statement is that whatever amount is to be paid will not exceed the amount of the security which has been established by the statute or by the policy itself. This would mean that if the actual amount of the security is the minimum required by the statute, then the limit of potential liability for an insurer would be $750,000. However, if as in this case, the insured voluntarily elects to obtain security in a larger amount, such as $1 million, then that amount becomes the limits of potential liability for the insurer for claims resulting from a single accident.

A similar limitation as to the amount of security which Defendant is potentially obligated to pay for claims arising out of an accident appears in the actual MCS–90 endorsement issued in this case. The language of the MCS–90 endorsement provides that "[i]t is understood that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, *within the limits of liability herein described,* irrespective of the financial condition, insolvency or bankruptcy of the insured." (Pls.' Compl., Ex. A) (emphasis added). The MCS–90 endorsement further provides that "[t]he limits of the company's liability for the amount prescribed in this endorsement apply to each accident and any payment under this policy because of any one accident shall not operate to reduce the liability of the company for the payment of final judgments resulting from any other accident." (*Id.*) The Court finds that this language supports Defendant's position and this finding that Defendant's potential liability for the amount of the security within the policy limits applies to a single accident regardless of the number of victims involved in that single accident. The Court further finds that this language cannot be interpreted to support Plaintiff's contention that Defendant is potentially liable for at least the statutory minimum security for each of the nine Plaintiffs with claims arising out of the single accident on July 8, 1995. However, this language does make it clear that an insurer for a motor carrier would not be relieved of financial responsibility for the full amount of the security for subsequent accidents, even though they may have paid the full amount of the security for a previous accident during the coverage period. The Court further notes that this language does not offer any support for Plaintiff's contention that Defendant must pay the full policy limit to each victim that may sustain injury in a single accident.

■ Plaintiffs again disagree and argue that any limitation on the amount of Defendant's financial obligation where there are multiple claimants in a single accident is against public policy. As support for this position, Plaintiffs cite authority which states that "the well settled 'policy imbedded in the

representing an explanation of the position Plain- tiffs have taken on the issues in this case.

statutes and regulations was to assure that injured members of the public would be able to obtain judgments collectible against negligent authorized carriers.'" *Canal Ins. Co. v. First Gen. Ins. Co.*, 889 F.2d 604, 611 (5th Cir.1989); *see also Maryland Cas. Co. v. City Delivery Serv., Inc.*, 817 F.Supp. 525, 530 (M.D.Pa.1993)("[t]he purpose of the ICC statutory law is to ensure that a financially responsible party will be available to compensate third persons injured in a collision with an ICC Carrier"). Plaintiffs contend that this public policy is enforced by the use of the MCS–90 endorsement which "negates any and all limiting or inconsistent language or clauses in the insurance policy to which it is attached." *Empire Fire & Marine Ins. Co. v. Guaranty Nat'l Ins. Co.*, 868 F.2d 357, 363 (10th Cir.1989). But a clear reading of the *Empire* case does not go as far as Plaintiffs would suggest. The purpose of the MCS–90 endorsement and the abuses it was designed to correct are adequately set out in *Empire* as follows:

> In the past, the use by truckers of leased or borrowed vehicles led to a number of abuses that threatened the public interest and the economic stability of the trucking industry. In some cases, ICC-licensed carriers used leased or interchanged vehicles to avoid safety regulations governing equipment and drivers. In other cases, the use of non-owned vehicles led to public confusion as to who was financially responsible for accidents caused by those vehicles.

> In order to address these abuses, Congress amended the Interstate Commerce Act to allow the ICC to prescribe regulations to insure that motor carriers would be fully responsible for the operation of vehicles certified to them.

> . . . .

> . . . Thus the ICC endorsement that is the subject of this appeal had its origin in the ICC's desire that the public be adequately protected when a licensed carrier uses a leased vehicle to transport goods pursuant to an ICC certificate.

> . . . A straightforward reading of the language suggests only that it negates any clauses in the body of the policy to which it

> is attached that would have the effect of limiting the insurance carrier's liability. That is, it deletes limiting clauses in the policy to which it is attached, but it does not create new, additional obligations in the policy. . . .

> An "excess coverage" clause is a "condition" or "limitation" that could "relieve the company of liability." Thus an excess coverage clause is the kind of limitation that the ICC endorsement is designed to render ineffective.

*Id.* at 362–63 (citations omitted).

It is clear from *Empire* that the abuse Congress sought to address with the Motor Carrier Act and subsequent regulations was any type of clause or language within a motor carrier's insurance policy which would totally deny protection to the public. The "excess coverage" clause as compared to a "primary coverage" clause was clearly viewed as the type of language which, if successfully asserted by an insurer, would leave the public unprotected from abuse because a negligent motor carrier would otherwise not have any liability coverage available to protect the public.

In addition to the discussion within *Empire* concerning the abuse which could arise from the use of "excess coverage" clauses, the court in *Empire*, citing the case of *Hagans v. Glens Falls Ins. Co.*, 465 F.2d 1249 (10th Cir.1972), also discussed how the use of an indemnification clause might be subjected to the public policy embodied within the Motor Carrier Act of 1980. *Empire*, 868 F.2d at 364. *Hagans* involved a dispute between two insurance carriers over the allocation of liability when both policies covered the same event. The issue was whether an indemnification clause in a lease contract could serve as a limiting condition on the lessee's insurance company's policy. The *Hagans* court held that it could not because the liability of the lessee's insurer had to be measured by the terms of the insurer's own policy, and not by the terms of a lease to which the lessee's insurer was not even a party. *See id.* However, an indemnification clause between insurance companies is not automatically negated by the MCS–90 endorsement. It has been stated that:

The regulations do not expressly prohibit an indemnification provision in the agreement between the lessor and the lessee. In fact, they neither sanction nor forbid it. It would seem to follow, then, that the mere presence of a clause such as the one here—that the lessor is to bear the burden of its own negligence—does not, in and of itself, offend the regulations so long as the lessee does not absolve itself from the duties to the public and to shippers imposed upon it by the Commission's regulations.

*American Gen. Fire & Cas. Co. v. Truck Ins. Exch.,* 660 F.Supp. 557, 565 (D.Kan.1987) (quoting *Transamerican Freight Lines, Inc. v. Brada Miller Freight Sys., Inc.,* 423 U.S. 28, 39–40, 96 S.Ct. 229, 234–35, 46 L.Ed.2d 169 (1975)) (emphasis omitted).

Another example of how the public could be subjected to abuse in violation of public policy without the protection afforded by the ICC endorsement is illustrated in the case of *Royal Indemnity Co. v. Jacobsen,* 863 F.Supp. 1537, 1538–39 (D.Utah 1994). The dispute in *Royal Indemnity* involved a tragic accident in which Mr. and Mrs. David Stinson ("the Stinsons") were traveling eastbound on a Nevada state road. A second driver, Alcide Carney ("Carney") was driving westbound in a large tractor trailer, crossed the center line and struck the Stinsons' vehicle head on. Mrs. Stinson was killed and Mr. Stinson was seriously injured. *Id.* Royal Indemnity attempted to deny coverage for its insureds, Michael and Kelly Holden ("the Holdens"), and Reed Jacobsen ("Jacobsen"), the driver of the Holden's vehicle at the time of the accident. Although, the Stinsons' vehicle was struck by Carney's vehicle, the Holdens, Jacobsen and Royal Indemnity were in the case because Jacobsen was traveling on the same highway where the accident took place. In fact, it was significant in the case that Jacobsen was hauling hay in one of the Holdens' tractor-trailers in route to a dairy farm. Carney claimed that Jacobsen had advised him over the CB radio that it was safe to pass Jacobsen's truck despite the existence of a curved roadway and Carney's lack of view. *See id.* Although the same ICC endorsement at issue in the case before this Court was involved in *Royal In-* *demnity,* Royal Indemnity attempted to rely upon an exemption within the Motor Carrier Act under section 49 U.S.C. § 10526(a)(6), as a means of avoiding liability under the policy issued to the Holdens. This portion of the statute provides as follows:

§ 10526. Miscellaneous motor carrier transportation exemptions

(a) The Interstate Commerce Commission does not have jurisdiction under this subchapter over—

(6) transportation by motor vehicle of—

. . . .

(B) agricultural or horticultural commodities (other than manufactured products thereof); [or]

. . . .

(E) livestock and poultry feed and agricultural seeds and plants, if such products (excluding products otherwise exempted under this paragraph) are transported to a site of agricultural production or to a business enterprise engaged in the sale to agricultural producers of goods used in agricultural production.

*Royal Indemnity,* 863 F.Supp. at 1541 (citing 49 U.S.C.A. § 10526(a)(6)(B), (E) (West Supp.1994)) (now codified as 49 U.S.C. § 13506).

Based on this language from the statute, Royal Indemnity argued that (1) "the ICC lacks jurisdiction over the transportation of agricultural commodities and livestock feed such as hay; (2) Jacobsen was hauling hay in one of the Holdens' tractor-trailers to a Pahrump, Nevada dairy on the day that the Stinson accident occurred; (3) therefore as a matter of law, that tractor-trailer was not 'subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980' on the Pahrump, Nevada trip, and the ICC endorsement is not applicable here." *Id.* "In the court's view, Royal's 'trip specific' reading of the Holdens' ICC endorsement (or any ICC endorsement for that matter) is incorrect." *Id.* As a policy matter, the court further stated that "it would undermine the clear intent of the Mo-

tor Carrier Act to hold, as Royal argues here, that the Stinsons are not protected in this case merely because Jacobsen was hauling hay on the day that the accident occurred. ... Application of the endorsement should not depend on whether Jacobsen was hauling one particular type of product on the day of the accident instead of another. Such an application would not advance the public policy goals of the Motor Carrier Act in protecting the general public, and it would also defy common sense." *Id.* at 1542. The court ultimately found that "once issued, bought, and paid for, the Holdens' ICC endorsement, and the public policy upon which it was based, provided coverage in this case—regardless of the type of product that Jacobsen was hauling on the day of the accident in question." *Id.* (citation omitted).

This Court finds that *Royal Indemnity, Empire,* and *Hagans,* illustrate the type of limitation clause or condition that the Motor Carrier Act of 1980 and the MCS–90 endorsement were designed to negate for the protection of the public. However, the Court finds that these cases do not support Plaintiffs' contention that Defendant's declaration of a policy limit within either the insured's insurance policy or the MCS–90 endorsement can be viewed as the type of limitation clause or condition that the Motor Carrier Act or the MCS–90 endorsement was designed to negate in order to prevent abuses against the public. In fact, in this case, both the declaration clause of the policy and the MCS–90 endorsement clearly state that the insurance carrier's liability is limited to $1 million per accident or occurrence. This Court finds that such a declaration of the policy limits within the policy and the MCS–90 endorsement itself does not render the policy or the endorsement inconsistent with the Motor Carrier Act of 1980. The Court further finds that to interpret the statute or the MCS–90 endorsement otherwise would indeed create a new obligation on behalf of the insurer to pay an amount beyond the stated policy limits. However, as stated in *Empire,* the statute and the endorsement were not designed to create any "new, additional obligations in the policy." *Empire,* 868 F.2d at 363.

Notwithstanding the language of the statute and the MCS–90 endorsement which, subject to the statutory minimum security, ties the potential liability of an insurer to the amount of the security stated within the policy, Plaintiffs argue that the MCS–90 endorsement transforms a motor carrier's insurance policy into a "surety bond" so as to allow injured parties to seek recovery from the insurer for each and every final judgment recovered against an insured without regard for the liability limits stated within the policy. (Pls.' Resp. to Def.'s Mot. for J. on the Pleadings at 8.) Plaintiffs' position is based upon their further contention that, in the event that an insurer pays more than the policy limits, the insurer has the opportunity to "to seek reimbursement for sums paid in excess of the policy directly from its insured." *Id.* Plaintiffs find support for this position based upon language within the MCS–90 endorsement which provides in this case that "the insured [Virginia Hiway Express] agrees to reimburse the [insurance] company ... for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement." (*Id.* at 8–9.) At first glance, this language appears to be helpful and supportive of Plaintiffs' argument that an insurer's potential liability is not limited by a stated policy limit. But again, it appears to the Court that Plaintiffs seek to go beyond the intended purpose of the language within the MCS–90 endorsement. The application of this language in the endorsement is more appropriately illustrated in the case of *American Inter–Fidelity Exchange v. American Re–Insurance Co.,* 17 F.3d at 1021. The facts in *American Inter–Fidelity* demonstrate that an insured with a $50,000 deductible on a $750,000 policy would indeed have to reimburse an insurer for the deductible in the instance where an injured victim was entitled to recover the full amount of the statutory minimum security of $750,000. However, the insurer would first have to pay the victim in full even though the insured may not have paid the $50,000 deductible. That is, the insurer would not be relieved of its obligation by paying just $700,000. Instead, the insurer would have to pay the

victim $750,000 and then enforce the insured's obligation to the insurer. *See id.* This scenario illustrates the application of the provision which requires an insured to reimburse the insurer. This also would be the result where the victim's or victims' loss was within the limits of the policy. However, this Court finds that this language of the endorsement which requires an insured to reimburse the insurer does not apply, as Plaintiffs would have it, under circumstances where victims seek to recover an amount in excess of the stated policy limits. Instead, as in the circumstances of the present case, the insurer would fulfill its obligation under the policy or the MCS–90 endorsement by paying out, where liability has been determined, the full amount of its policy limits, which would consist of at least the statutory minimum of $750,000 for each accident or occurrence.

It is further argued by Plaintiffs that Defendant improperly attempts to limit its liability by relying on the phrases "each occurrence" and "each accident" which appear respectively within the declarations page in the policy and in the MCS–90 endorsement attached to the insured's policy. However, the Court finds that Plaintiffs have not offered any authority to support their contention that the use of phrases such as "each occurrence" or "each accident" in defining the monetary policy limit is the type of limitation language that the MCS–90 endorsement was designed to negate. Moreover, the fact that the phrase "each accident" is used in the illustration of an approved MCS–90 endorsement form, which appears in the regulations, indicates to this Court that Plaintiffs' argument on this point is without merit. *See* 49 C.F.R. § 387.15.

While the Court understands that the Plaintiffs seek to impose additional financial responsibility on the Defendant because of the tragic circumstances of the accident which occurred on July 8, 1995, the Court, nevertheless, must find and conclude as a matter of law that based upon the clear language of the policy in question and the actual MCS–90 endorsement involved in this case, Defendant's potential liability for the single accident which occurred on July 8,

1995 is limited to $1 million as stated in both the policy and the MCS–90 endorsement issued to Virginia Hiway Express. Therefore, Defendant's Motion for Judgment on the Pleadings [Document # 16] is ALLOWED. The Court further finds that, in the event of a final judgment of liability, Defendant may satisfy its financial obligation to its insured for the single accident which occurred on July 8, 1995 by tendering the policy limits of $1 million dollars. An Order and Judgment consistent with this Memorandum Opinion will be filed contemporaneously herewith.